UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| KERWYN LYKKEN and<br>ESTHER LYKKEN, | ) | CIV. 07-4020-KES |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER GRANTING |
| CRYSTAL BRADY; | ) | DEFENDANTS' MOTIONS |
| KEVIN THOM, Special Administrator | ) | FOR SUMMARY JUDGMENT |
| of the Michael Braley Estate; | ) | AND DISMISSING STATE- |
| FRED DEVANEY; | ) | LAW CLAIMS |
| TREVOR JONES; | ) | |
| KEVIN THOM; and | ) | |
| MIKE BUCHOLZ, | ) | |
| | ) | |
| Defendants. | ) | |

This case arises out of a series of searches of the Lykken family farm

conducted by defendants, Agents Michael Braley,[1] Fred Devaney, Trevor Jones,

and Kevin Thom of the South Dakota Division of Criminal Investigation (DCI),

Vermillion Police Department Detective Crystal Brady, and Union County

Deputy Sheriff Mike Bucholz in 2004 and 2007. Plaintiffs Kerwyn Lykken and

Esther Lykken filed suit against defendants, alleging violations of the Fourth

Amendment based on the alleged unreasonableness of the searches of the

Lykken property and the seizures of Esther and Kerwyn, the insufficient

---

[1] Braley died while this case was pending. Kevin Thom, Special Administrator of the Michael Braley Estate, was substituted as a party in place of Braley. For the sake of clarity and convenience, the court will refer to Kevin Thom, Special Administrator of the Michael Braley Estate as "Braley."

particularity of the search warrant, and the lack of probable cause supporting the searches. Plaintiffs also alleged state-law claims of conversion and trespass against all defendants, breach of implied and express contract against Jones, Braley, and Devaney, and emotional distress against Thom, Devaney, and Brady (for Esther) and Bucholz and Braley (for Kerwyn).

Defendants assert that plaintiffs' suit is barred by the doctrine of qualified immunity. Defendants moved for summary judgment on all of plaintiffs' claims. The court granted summary judgment in favor of defendants on Kerwyn's claim that he was unreasonably seized in violation of the Fourth Amendment, plaintiffs' claim that the search warrant was insufficiently particular, plaintiffs' claim that defendants lacked probable cause for the searches, and plaintiffs' claims of breach of contract. The court reserved ruling on plaintiffs' claim that the searches were unreasonable and that Esther was unreasonably seized and allowed plaintiffs to conduct limited discovery. The court denied without prejudice defendants' motions for summary judgment on the state-law claims of conversion, trespass, and emotional distress. Plaintiffs conducted additional discovery and submitted an amended statement of undisputed material facts and memorandum in opposition to defendants' motions for summary judgment. Braley, Devaney, Jones, and Thom filed a renewed motion for summary judgment on all the remaining claims.

## BACKGROUND

The facts, with all reasonable inferences drawn in favor of plaintiffs and as relevant to the remaining issues in the case, are as follows: Esther and Kerwyn are the owners of farmland in rural Union County, South Dakota (hereinafter referred to as Lykken property). Both Esther and Kerwyn maintain a residence on the land.

In 2004, the South Dakota Attorney General's Office reopened an investigation into the 1971 disappearance of two teenage girls in rural Union County. Braley was assigned to the case as the lead investigator. David Lykken, who is incarcerated at the South Dakota State Penitentiary, became a suspect in the investigation. David Lykken is the son of Esther and brother of Kerwyn, and he resided on the Lykken property in 1971.

Braley applied for and obtained a search warrant for the Lykken property on August 20, 2004. The warrant authorized officers to search for the bodies or remains of the missing girls; clothing, jewelry, and other personal items belonging to the missing girls; a vehicle; and other items. The warrant was executed on August 24, 2004, by Braley, Devaney, Jones, and Thom, all of whom were acting as agents of DCI. Brady and Bucholz also were present on August 24, 2004, and assisted in the execution of the search warrant. Defendants arrived at the Lykken property around 10 a.m. When they arrived, Kerwyn, Esther, and other family members were moving cattle from the pens

north of the highway running through the Lykken property to the pens south of the highway. Bucholz and Braley immediately and physically separated Kerwyn from his family members, and Brady and Devaney immediately and physically separated Esther from her family members. Kerwyn was confused and told defendants to stand back because the cars and people were spooking the cattle, but Bucholz and Braley intentionally stopped him, and Devaney and Brady intentionally stopped Esther from steering the cattle and moving them. Bucholz told Kerwyn that he could not finish moving the cattle. Defendants did not make any efforts to round up the cattle. When Kerwyn asked Bucholz and Braley about catching and feeding the cattle, Bucholz told him that the cattle would be fine and the neighbors would take care of them. After defendants prevented Kerwyn and Esther from rounding up the cattle, the cattle ran back into the north yard, broke through the fence, and ran into a corn field. The cattle remained in the corn for over a week, causing damage.

After separating Kerwyn from his family members, Braley and one other officer took Kerwyn to a car and interviewed him. The officers compelled Kerwyn to walk around the Lykken property and answer their questions about prior use of the buildings. Shortly thereafter, Braley and Bucholz told Kerwyn that he was no longer welcome at the farm and that they wanted to talk with him at the Union County Courthouse in Elk Point. Kerwyn drove to Elk Point around 11 a.m., where he was questioned until 2 p.m. Braley and Bucholz

accused Kerwyn of crimes and insinuated that he had knowledge of the 1971 disappearances. Bucholz also said awful things about Kerwyn's deceased brother and father. At about 2:30 p.m., Bucholz told Kerwyn that they wanted to conduct a polygraph examination. Kerwyn drove to Vermillion, where Jones interrogated him until about 7 p.m. Jones accused Kerwyn of participation in the coverup of the 1971 disappearances, disposal of the bodies, and disposal of the vehicle. Kerwyn demanded to leave because the accusations against his father were just too much. Kerwyn returned to the Lykken property after the polygraph examination in order to take care of the cattle, but Bucholz told him to leave.

Meanwhile, Esther was also separated from her family members by Devaney and Brady right after defendants arrived to search the Lykken property. Brady made Esther show her around the Lykken property. They rode on a golf cart because Esther was 84 years old and had difficulty moving around the farm. Brady questioned Esther about the prior use of the farm and whether there were ever any unfamiliar vehicles in the yard. The questioning continued inside Esther's home, where Devaney was waiting. Brady and Devaney accused Esther of hiding the truth about crimes committed by her husband and sons and of assisting her sons in the rape, kidnapping, and murder of the two girls in 1971. Esther claims that Brady spoke too close to Esther's face, asked Esther a lot of questions, raised her voice, and used an

accusatory tone of voice. Neither Brady nor Devaney ever physically touched or restrained Esther. Esther testified that Brady did more of the questioning than Devaney.

At some point after questioning Esther, Brady and Devaney escorted Esther outside and told her to sit on a bench in her yard. Esther claims that Brady and Devaney sat with her on the bench for awhile, but left her at some point. Esther testified that she was permitted to stand and walk around and to re-enter the house to use the bathroom. Deposition of Esther Lykken, July 24, 2006, Docket 178-7 at 26. Esther also testified that she did not re-enter the house to eat lunch or dinner, and she does not remember if she was allowed to get a glass of water during the day. Id. at 26-27. Brady and Devaney did not allow Esther to enter her house during the search to cook, turn off the stove, or care for her cats (one of which was pregnant) while officers conducted the search.

Esther has provided conflicting testimony on whether she was allowed to leave the Lykken property after the questioning was over. Esther testified that she was never told she could not leave the property: "No, I was not told I couldn't leave. But why would I leave home? That thought never entered my mind, that I would have left, no." Deposition of Esther Lykken, August 21, 2007, Docket 178-8 at 27. In an affidavit dated October 11, 2007, however, Esther claimed that she was told that she had to remain at the farm. Affidavit

of Esther Lykken, Docket 178-2, ¶ 9.  It is undisputed that around 8 p.m., an officer (alleged to be Thom) ordered Esther to enter the house and said to her, "You and Kerwyn get your act together tonight.  You confess, and when we come in the morning, why, we'll have your confession and we'll be out of here immediately.  There won't be anymore digging."  Amended Plaintiffs' Joint Statement of Material Facts, Docket 170, ¶53.

Defendants excluded Esther and Kerwyn from the Lykken property until noon on August 28, 2004.  When Esther returned to her home after defendants were finished searching, she found her home in a terrible mess.  Her stove was filthy.  Her cat had given birth, and several kittens died.  Also, one of Esther's refrigerators or freezers was unplugged by unidentified officers, causing the food to spoil and produce a foul odor.

Kerwyn found his home in damaged condition as well.  His basement was flooded with ankle-high water, apparently because unidentified officers had removed the drain hoses attached to the air conditioner.  As a result, some of Kerwyn's personal property was wet, moldy, and ruined.  Kerwyn also complains that defendants dug holes on the Lykken property, failed to properly refill the holes, and left the door to Kerwyn's shop open resulting in damage to the door, but this court previously found that these actions were not unreasonable.

Defendants obtained and executed two additional search warrants on the Lykken property in conjunction with their investigation of David Lykken. On November 16, 2004, defendants conducted a search for a vehicle and other large items believed to be involved in the 1971 disappearances. This search resulted in the digging of large holes on the Lykken property. Bucholz and another unknown officer directed Kerwyn to move his fat cattle on three occasions during this search. Kerwyn's cattle took three months longer than normal to fatten for market, requiring extra feed at a cost of $4,000. Finally, on February 5, 2007, defendants searched the Lykken property for a Bible and writings relevant to the investigation of David Lykken. There are no outstanding issues relating to this search.

Plaintiffs allege that the searches of the Lykken property and the related interrogations hurt their physical and emotional health. Esther complains that while she was in good physical health before the August 24, 2004, search, after the search she had trouble sleeping and developed high blood pressure. She also complains of racing thoughts, tiredness, poor concentration, forgetfulness, rapid heartbeat, dizziness, feelings of panic, and hyperventilation. Kerwyn complains that he was shocked, horrified, repulsed, disgusted, depressed, and fearful of being ostracized by friends and family after the August 24, 2004, interrogations. He also claims that he has suffered sleep disturbance, appetite disturbance, and anxiety.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Only disputes over facts that might affect the outcome of the case under the governing substantive law will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Summary judgment is not appropriate if a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record. Vette Co. v. Aetna Cas. & Sur. Co., 612 F.2d 1076, 1077 (8th Cir. 1980). The nonmoving party may not, however, merely rest upon allegations or denials in its pleadings, but must set forth specific facts by affidavits or otherwise showing that a genuine issue exists. Forrest v. Kraft Foods, Inc., 285 F.3d 688, 691 (8th Cir. 2002).

**DISCUSSION**

## I.  Federal Claims

In Counts 1 and 2 of the amended complaint, brought pursuant to 42 U.S.C. § 1983, plaintiffs allege that defendants' violated their Fourth Amendment rights to be free from unreasonable searches and seizures. Defendants argue that these claims are barred by the doctrine of qualified immunity.

### A.  Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " Pearson v. Callahan, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)).  Qualified immunity serves as "an entitlement not to stand trial or face other burdens of litigation . . . ." Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L. Ed. 2d. 411 (1985).  "To overcome the defense of qualified immunity, a plaintiff must show: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." Howard v. Kansas City Police Dep't, No. 08-2448, ___ F.3d ___, 2009 WL 1885495, at *2 (8th Cir. July 2, 2009).  In Saucier v. Katz,

533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001), the Supreme Court required lower courts to consider these two requirement in order.  See Howard, 2009 WL 1885495, at *2.  In Pearson v. Callahan, 129 S. Ct. at 818, however, the Court held that the Saucier procedure is no longer mandatory, so that lower courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  Here, the court elects to proceed under the traditional Saucier framework and determine first whether plaintiffs have demonstrated a violation of their Fourth Amendment rights before determining whether such rights were clearly established.  If plaintiffs fail to meet either prong of the qualified immunity test, qualified immunity shields defendants from suit.  Saucier, 533 U.S. at 200-01.

### B.     Unreasonable Search

In Count 1, plaintiffs claim that the August 2004 and November 2004 searches of the Lykken property were conducted in an unreasonable manner in violation of the Fourth Amendment.  The Fourth Amendment protects against unreasonable or unnecessarily destructive searches and seizures.  Ginter v. Stallcup, 869 F.2d 384, 388 (8th Cir. 1989) (per curiam).  While "officers executing search warrants on occasion must damage property in order to perform their duty," Dalia v. United States, 441 U.S. 238, 258, 99 S. Ct. 1682, 60 L. Ed. 2d 177 (1979), "any destruction caused by law enforcement officers in

the execution of a search . . . warrant must be necessary to effectively execute that warrant." Ginter, 869 F.2d at 388. Thus, "[a]lthough how best to proceed in performing a search is generally left to the discretion of officers executing a warrant, possession of a search warrant does not give the executing officers a license to proceed in whatever manner suits their fancy." Hummel-Jones v. Strope, 25 F.3d 647, 650 (8th Cir. 1994). Rather, "the manner in which a warrant is executed is always subject to judicial review to ensure that it does not traverse the general Fourth Amendment proscription against unreasonableness." Id.

### 1. August 2004 Search

Considering the first prong of the qualified immunity test, the court finds that the manner in which defendants executed the August 24-28, 2004, search warrant violated the reasonableness requirement of the Fourth Amendment. The intrusion on plaintiffs' farming lifestyle was severe. Defendants arrived at the Lykken property while Kerwyn, Esther, and several family members were moving cattle from one pen to another pen. Bucholz, Braley, Devaney, and Brady prevented Kerwyn and Esther from finishing the task, even though it was clear that some of the cattle had broken through a fence and run into a corn field and even though Kerwyn specifically requested to be allowed to catch and feed the cattle. Defendants made no efforts to help round up the cattle when they first arrived on the Lykken property and after they had separated

Kerwyn and Esther from the group, despite assuring Kerwyn that the cattle would be fine. Kerwyn returned from his polygraph examination and interrogation in Vermillion that evening in order to take care of the cattle, but Bucholz told him to leave. Kerwyn, Esther, and other members of their family were excluded from the Lykken property for four days, during which they were unable to feed, watch over, and otherwise care for the cattle.

Further, Brady and Devaney refused to allow Esther to enter her house to finish the meal she was cooking or even to turn off the stove. Brady and Devaney also refused to allow Esther to check on her pregnant cat. During the four days in which Esther was excluded from the Lykken property, she was unable to feed or care for her cats. During that time, the pregnant cat gave birth, and several kittens died all over the house.

The effect of defendants' refusal to allow plaintiffs to round up the cattle that had run into the corn field, to care for the cattle during the four days it took to execute the search warrant, to turn off the stove, and to check on the pregnant cat and newborn kittens was a severe intrusion on plaintiffs' home and farm. The animals were dependent on plaintiffs for food, water, and shelter. It was unreasonable for defendants to execute the search warrant in a way that left the helpless animals subject to the August heat for four days without food, water, and supervision. Cf. White v. Rochford, 592 F.2d 381, 382, 384 (7th Cir. 1979) (finding that officers violated Due Process Clause in

13

leaving three children in an abandoned automobile on the side of a busy freeway during inclement weather after arresting and detaining the driver for drag racing, despite the driver's request that the officers take the children to the police station or a phone booth so they could call for help).

Defendants' manner of executing the search warrant also exposed plaintiffs to potential criminal and civil liability. Under South Dakota law, it is a Class I misdemeanor for a person owning or responsible for the care of an animal to inhumanely treat that animal. SDCL 40-1-27. Inhumane treatment includes 'the failure to provide food, water, protection from the elements, adequate sanitation, [or] adequate facilities." SDCL 40-1-2.3 to -2.4. Plaintiffs were unable to fulfill their minimum legal obligations of providing food, water, and protection to their cattle because they were excluded from the Lykken property for four days. As a result, plaintiffs were vulnerable to criminal charges.

Defendants' refusal to allow plaintiffs to round up their cattle exposed plaintiffs to civil liability for damages and injuries caused by their loose cattle as well. Indeed, under South Dakota law, persons owning or having charge or possession of cattle are liable for any damages caused by the trespass of the cattle upon the land of others. SDCL 40-28-4. Cattle owners are also liable for injuries caused by the presence of their cattle on a highway if they should reasonably have anticipated that a collision, accident, or other injury would

14

result from the presence of the cattle on the highway.  Estate of Shuck v. Perkins County, 577 N.W.2d 584, 587 (S.D. 1998) (quoting Eixenberger v. Belle Fourche Livestock Exch., 58 N.W.2d 235, 237 (S.D. 1953)).  Thus, defendants' refusal to allow plaintiffs to round up their loose cattle exposed plaintiffs to civil liability for damages that could have been caused by the loose cattle.

Moreover, defendants' refusal to allow plaintiffs to round up and care for the cattle was not necessary for defendants to exercise their duty to search the Lykken property for evidence relating to the 1971 disappearance of two teenage girls.  Defendants were justified in digging holes in the land and in the floors of certain buildings, in displacing items in the house, in removing food from the refrigerators and freezers, and in generally creating a mess in plaintiffs' homes because these destructive acts were necessary to search for the items listed in the search warrant.  See Cook v. Gibbons, 308 Fed. Appx. 24, 30-31 (8th Cir. 2009) (finding that search involving damage to personal effects, dumping of trash, and emptying of closets and drawers was not unreasonable because those activities were reasonably necessary to conduct a thorough search for the items identified in the warrant).

But it was not necessary for defendants to refuse to allow Kerwyn to round up the cattle that had run into the corn field.  Defendants had just arrived on the Lykken property, and Esther, Kerwyn, and other family members were within the sight and control of a number of law enforcement

15

officers.  Defendants could have supervised the rounding up of the cattle without risking the destruction of evidence because the occupants of the Lykken property were all gathered where the officers could see them. Moreover, because Bucholz and Braley planned to stay with Kerwyn during the search, and Brady and Devaney planned to stay with Esther, the remaining officers could have begun the search without losing the time it would have taken for plaintiffs to round up the cattle.  There is also no indication that the presence of the cattle in either the north or south pen would have interfered with the execution of the search warrant.  Thus, preventing plaintiffs from rounding up the cattle was not necessary to effectively execute the search warrant.  Likewise, while defendants were entitled to prevent plaintiffs from interfering with the execution of the search warrant, it was unnecessary to completely exclude them from their farm for four days while their cattle went unfed and unsupervised.  The search team was large enough that defendants could have allowed plaintiffs onto the property and supervised them while they performed their farm chores during the four-day search.

Similarly, the court finds that Brady and Devaney's refusal to allow Esther to enter the house for the amount of time it would have taken to turn off the stove and check on her cats was unnecessary and unreasonable.  Brady and Devaney were assigned to supervise and question Esther for the entire day on August 24, 2004; there was no law enforcement reason to refuse to allow her

to enter the house to perform two simple tasks, the omission of which caused a serious mess.  Further, just as it was unnecessary to exclude plaintiffs from the Lykken property for four days so that plaintiffs could not feed and check on their cattle, it was unnecessary to exclude Esther from her home for four days after she expressed concern about the well-being of her pregnant cat.  While defendants had discretion in deciding how to execute the search warrant, the court finds that defendants' conduct caused unnecessary destruction to the Lykken property, cattle, and kittens and unnecessarily exposed plaintiffs to criminal and civil liability arising out of the condition of the cattle.  Under these circumstances, defendants acted unreasonably in executing the August 2004 search warrant, violating plaintiffs' Fourth Amendment rights.  See Hummel-Jones, 25 F.3d at 650.

Moving to the second prong of the qualified immunity analysis, the court finds that defendants are nonetheless entitled to summary judgment on plaintiffs' unreasonable search and seizure claim relating to the August 2004 search because the constitutional rights they violated were not clearly established at the time of the deprivation.  "For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Hill v. McKinley, 311 F.3d 899, 904 (8th Cir. 2002) (internal quotation and citation omitted).  "The relevant, dispositive inquiry in determining whether a right is

clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202. The unlawfulness must be apparent in the light of preexisting law. Hill, 311 F.3d at 904.

Here, plaintiffs have not cited, and the court is unaware of, any cases finding that law enforcement officers acted unreasonably in preventing the occupants of the premises subject to a search warrant from rounding up their livestock and caring for their animals for four days. Nor has plaintiff identified any cases articulating that the occupants of the premises have a right to be present during the execution of a search warrant. Thus, it would not have been clear to a reasonable officer in August 2004 that his or her conduct was unlawful in light of the circumstances of the search of the Lykken property. Indeed, there is case law suggesting that harm to animals caused during the execution of a search warrant violates a constitutional right only when the officers intentionally harmed or killed the animals. Cook, 308 Fed. Appx. at 31 (citing San Jose Charter of the Hells Angels Motorcycle Club v. City of San Jose, 402 F.3d 962 (9th Cir. 2005)). Further, there is an extensive body of case law finding that destruction of personal property is not unreasonable when necessary to conduct a thorough search for items identified in a search warrant. See id. (citing DeArmon v. Burgess, 388 F.3d 609, 610-11 (8th Cir. 2004); Liston v. County of Riverside, 120 F.3d 965, 979 (9th Cir. 1997); Tarpley v.

Greene, 684 F.2d 1, 9 (D.C. Cir. 1982)).  Finally, the well-established rule that officers are entitled to detain the occupants of the premises subject to a search warrant in order to prevent flight, minimize the risk of harm to the officers, and facilitate orderly completion of the search makes defendants' belief that they could take the less intrusive action of excluding plaintiffs from the Lykken property during the four-day search reasonable.  See Michigan v. Summers, 452 U.S. 692, 702, 101 S. Ct. 2587, 69 L. Ed. 2d 340 (1981).  Nothing in these cases would make it clear to defendants that their conduct in executing this search warrant was constitutionally impermissible.

Defendants violated plaintiffs' rights to be free from unreasonable searches by the manner in which they executed the search warrant in August 2004.  But this right in this situation was not clearly established at the time the officers conducted the search, so defendants are entitled to qualified immunity on plaintiffs' claim that defendants' conduct violated the Fourth Amendment.[2]

---

[2] Defendants argue that they are individually entitled to qualified immunity because plaintiffs have not shown which defendants were actually involved in the conduct and property destruction plaintiffs complain of. Because the court finds that defendants are entitled to qualified immunity even if each defendant was involved in all of the unreasonable conduct, it is unnecessary to further consider the individual involvement of each defendant.

### 2. November 2004 Search

Plaintiffs also allege that defendants acted unreasonably in the execution of the search warrant on November 16, 2004. Considering the first prong of the qualified immunity test, the court finds that the manner in which defendants executed the search warrant did not violate the Fourth Amendment's reasonableness requirement. Plaintiffs complain that Bucholz and another officer required Kerwyn to move his fat cattle three times during this search. While moving the cattle may have disturbed them to the point that they required three months longer than usual to fatten for market, Bucholz's instructions were not unreasonable in light of the purposes of the search.

Defendants obtained a warrant to search for a vehicle believed to be involved in the 1971 disappearances, which required examining the land for signs of previous disturbance and digging large holes in certain areas of the Lykken property. It was reasonable for Bucholz to conclude that the cattle had to be moved to properly inspect and dig in the land. Thus, Bucholz's conduct in conducting the November 2004 search was necessary to effectively execute the warrant. See United States v. Becker, 929 F.2d 442, 446-47 (9th Cir. 1991) (finding that use of jackhammer to break concrete slab and search beneath it was not unreasonable in light of the circumstances). Bucholz and the other officers involved in this search did not traverse the Fourth Amendment proscription against unreasonableness.

Because plaintiffs failed to show that defendants violated their constitutional rights in executing the search warrant on November 16, 2004, they have failed to meet the first prong of the qualified immunity test, and defendants are entitled to qualified immunity on this claim.  See Saucier, 533 U.S. at 200-01 (qualified immunity shields defendants from suit if plaintiffs fail to meet either prong of the qualified immunity test).

### C.    Unreasonable Seizure of Esther

In Count 2, Esther claims that she was unreasonably seized during the August 24, 2004, search of the Lykken property in violation of her Fourth Amendment rights.  In Michigan v. Summers, 452 U.S. at 705, the Supreme Court announced that "for Fourth Amendment purposes, . . . a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted."  "An officer's authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.' " Muehler v. Mena, 544 U.S. 93, 98, 125 S. Ct. 1465, 161 L. Ed. 2d 299 (2005) (quoting Summers, 452 U.S. at 705 n.19).  But the amount of force used to effectuate the detention must be reasonable.  Id. (citing Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)).  "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires

a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." <u>Graham</u>, 490 U.S. at 396 (internal quotation and citation omitted).

Considering the first prong of the qualified immunity test, the court finds that defendants did not violate Esther's Fourth Amendment right to be free from an unreasonable seizure of her person. Esther was unquestionably seized within the meaning of the Fourth Amendment when defendants arrived on the Lykken property the morning of August 24, 2004, and Brady and Devaney separated her from her family members. But the Supreme Court has made clear that officers have the categorical authority to detain the occupants of the premises while executing a warrant to search for contraband. <u>Mena</u>, 544 U.S. at 98. Thus, because Brady and Devaney were on the Lykken property to execute a valid search warrant, they were authorized to separate Esther from her family members, to force Esther to show them around the property, and to question Esther after the tour.

After Brady and Devaney escorted Esther outside and told her to sit on a bench in the yard, however, it is unclear whether Esther was still being seized within the meaning of the Fourth Amendment. Esther has provided conflicting testimony on whether she was free to leave the Lykken property. On the one hand, she testified that nobody told her she could not leave the property, but that she stayed because it never entered her mind to leave home. On the other

hand, she stated by affidavit that she was told she had to remain at the farm. The court need not resolve Esther's conflicting testimony because even if the seizure of Esther continued from the time Brady and Devaney escorted her outside until around 8 p.m. when another officer ordered her to leave the Lykken property, this seizure meets the reasonableness requirement of the Fourth Amendment.

While Brady and Devaney were authorized to detain Esther incident to the search, the amount of force they used to effectuate this detention must be reasonable. Id. To determine whether the force used to effect the seizure of Esther was reasonable, the court must balance the nature and quality of the intrusion on Esther's Fourth Amendment interests against the countervailing governmental interests at stake. Graham, 490 U.S. at 396. The duration of a detention can affect this balance of interests. Mena, 544 U.S. at 100; see also Hummel-Jones, 25 F.3d at 652 n.8 ("It is clear that Summers did not announce a per se rule authorizing the hours-long detention of anyone found on any premises being searched subject to a warrant, regardless of the circumstances, but simply permits the temporary detention of those residents of a house rendered suspect by a contraband warrant for that house.").

The intrusion on Esther's Fourth Amendment interests was slight. She was detained from late morning until 8 p.m., but she was free to stand and walk around and to use the restroom. She did not re-enter her house to eat

lunch or dinner, but there is no indication that Brady or Devaney refused to provide her with food or water. Esther was never physically touched or restrained, and she was never placed in handcuffs. On the other hand, Brady, Devaney, and other officers had strong governmental interests in detaining Esther. They could reduce the risk of harm to themselves and facilitate the orderly completion of the search of Esther's home by keeping Esther nearby to open locked doors, provide the combinations to locked safes, and provide other assistance. See Summers, 452 U.S. at 702-03 (explaining that detention furthers the legitimate government interests in minimizing the risk of harm to officers and facilitating the orderly completion of the search). The court is sympathetic to the discomfort Esther experienced in having to sit outside all day on a hot summer day while her home and land were searched by a number of law enforcement officials, but the court finds that the intrusion on Esther's Fourth Amendment interests caused by the duration of the seizure is outweighed by the countervailing governmental interests at stake for defendants. See Mena, 544 U.S. at 100 (holding that several hour detention where occupants were handcuffed, confined to garage, and guarded by several officers did not outweigh government's countervailing safety interests).

Thus, the amount of force used to effectuate the seizure of Esther on August 24, 2004, was not unreasonable, and this seizure did not violate her Fourth Amendment rights. Esther has failed to establish the first prong of the

qualified immunity test, so defendants are entitled to qualified immunity on this claim.

## II. State-Law Claims

In addition to their constitutional claims, plaintiffs allege state-law claims of conversion, trespass, and emotional distress. The district court has supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367(a), which provides that "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." But the court "may decline to exercise supplemental jurisdiction over a [state-law claim] if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). In deciding whether to exercise supplemental jurisdiction over state-law claims, district courts should "consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity." City of Chicago v. Int'l Coll. of Surgeons, 522 U.S. 156, 173, 118 S. Ct. 523, 139 L. Ed. 2d 525 (1997).

Having granted summary judgment in favor of defendants on plaintiffs' constitutional claims, the court declines to exercise supplemental jurisdiction over plaintiffs' state-law claims because these claims raise issues of state tort law and the state-law doctrine of official immunity that are best resolved by the

state court.  Thus, the values of judicial economy, convenience, fairness, and comity are best served by the court declining to exercise jurisdiction over plaintiffs' claims of conversion, trespass, and emotional distress.  These claims are dismissed.

Accordingly, it is hereby

ORDERED that defendants' motions for summary judgment (Dockets 39, 78, 83) are granted with respect to Counts 1 and 2 of the First Amended Complaint and Demand for Jury Trial.

IT IS FURTHER ORDERED that Counts 6, 7, 11, and 12 of the First Amended Complaint and Demand for Jury Trial are dismissed without prejudice.

IT IS FURTHER ORDERED that Braley, Thom, Devaney, and Jones's renewed motion for summary judgment (Docket 179) is denied as moot.

Dated July 27, 2009.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE